# IN THE SUPREME COURT OF IOWA

No. 20–0330

Submitted October 14, 2020—Filed February 19, 2021
Amended February 19, 2021

**IN THE INTEREST OF D.D.,** Minor Child.

**E.D.,** Father,

> Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Des Moines County, Emily Dean, District Associate Judge.

A father seeks further review of a court of appeals decision affirming the dismissal of a petition to adjudicate a child in need of assistance. **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED.**

McDermott, J., delivered the opinion of the court, in which Christensen, C.J., and Appel, Waterman, and Oxley, JJ., joined. Christensen, C.J., filed a special concurrence. Mansfield, J., filed a dissenting opinion in which McDonald, J., joined.

Trent A. Henkelvig (argued) of Henkelvig Law, Danville, for appellant.

Thomas J. Miller, Attorney General, Mary A. Triick (argued), Assistant Attorney General, and Erin Stensvaag, Assistant County Attorney, for appellee.

Diana L. Miller (argued) of Whitfield & Eddy, P.L.C., Mt. Pleasant, attorney for minor child.

Patrick Brau of Brau Law Office, Mt. Pleasant, guardian ad litem for minor child.

**McDERMOTT, Justice.**

A seven-year-old girl was sexually abused by her stepfather. The State initiated a child-in-need-of-assistance proceeding, and the juvenile court removed the girl from the home. The court later permitted the girl to return to the home only after the stepfather had been forbidden from living there. But the girl's mother—the wife of the perpetrator—refused to accept the sexual abuse finding against the stepfather. Not long after the victim returned home, the juvenile court permitted the stepfather to return to the home too and dismissed the child-in-need-of-assistance proceeding. In this appeal, we review the juvenile court's decision to end a child-in-need-of-assistance proceeding in which the child victim of sexual abuse has been returned to the home with the perpetrator and in which the child's mother refuses to believe any sexual abuse ever occurred.

## I. Factual Background.

**A. The Founded Report of Sexual Abuse.** D.D.'s mother has five children, each with a different biological father, but each living with the mother. D.D.'s half brother Z.H. (age ten) set in motion the events of this case in late February 2018 when he told his teacher that his stepfather was "cheating" on his mom with his sisters. When he clarified that he was talking about something sexual in nature, school officials immediately spoke separately to all three of his half sisters. When the Iowa Department of Human Services (DHS) contacted the children's mother about the allegations, the mother denied any knowledge and said she didn't believe her husband would harm the children. But she agreed to have all five of her children stay temporarily at her aunt's house and agreed that her husband wouldn't have contact any with the children as DHS investigated the allegations.

The following week each of the mother's children (except the youngest one, who was only four years old at the time) participated in a forensic interview with a child protection caseworker. The oldest child, a girl named H.T. (age thirteen), was apprehensive in her interview and, according to her interviewer, appeared to have been coached. H.T. told the interviewer that she thought her sisters were "messing with" Z.H. when they told her and Z.H. about the stepfather's sexual abuse. But she also suggested concern for her sisters' safety, and she made a cryptic statement that "maybe someone should be worried about her today."

Z.H. made comments suggesting his mother had instructed him to limit what he disclosed to his interviewer. In answer to a question about concerns at home, he responded that "mom told me not to say." Later in the interview, he confirmed that his sisters told him their stepfather had touched "their inappropriate body parts." Z.H. said his mother told him not to tell anyone what the girls had told him, but he told the interviewer that when questioned by school officials, "I got scared so I just answered." He admitted to feeling worried to go home from school the day he disclosed the abuse. Z.H. told the interviewer that his sisters said they were kidding once they got home from school. Z.H. also told the interviewer that his stepfather had told the kids he loved them and that he "won't do it anymore." When asked how he knew that his stepfather wouldn't do it anymore, he responded, "I just know."

H.H. (age nine) refused to talk about the details of the allegations in her interview. The interviewer described her demeanor as "fidgety and nervous." H.H. told her interviewer that she "trusts no one." She admitted she told Z.H. about their stepfather's abuse but claimed in her interview that she was joking. When asked why her sister D.D. might claim sexual abuse occurred, H.H. suggested maybe only D.D. was abused. But H.H.

nonetheless expressed her wish to stay at her aunt's home, telling the interviewer that her mother and stepfather were mean and that she didn't feel safe with them. When asked whether she has watched movies in her stepfather's bed, she aggressively said "never" and then refused to answer any more questions.

D.D. (age seven), when asked why her stepfather had been banned from the home, said it was because he touched kids in inappropriate places and that people who do that should go to prison. She noted that her stepfather only inappropriately touched girls (meaning her and her sister H.H.), but that he stopped doing it to H.H. and now only did it to her.

During the course of her interview, D.D. gave specific, often graphic, details of the sexual acts her stepfather performed on her. She informed the interviewer that at bedtime her stepfather would tell her to go to his room. He would put on a scary movie and take off D.D.'s pants and underwear. She described what happened as her stepfather "humping her with his wiener," meaning her stepfather "pulls his wiener forward and touches my private." By "private," D.D. said she was referring to "the part of the body where babies come out." He would make her keep her hands on the bed, and keep her knees pulled up to her chest, "so he can do his thing." When asked what that meant, she said, "He sticks his wiener into me." She added that his "wiener" was "humongous."

D.D. said her stepfather then "starts doing sex to me. . . . When he starts, he pulls it out, he holds it . . . . The thing where you get your baby out of . . . sometimes it gets shoved . . . sometimes his wiener is touching it on the inside. . . . [He] goes up and down with his body." When asked what it feels like, she described it as "pretty wet and disgusting," and said that it made her body "feel like it is getting stabbed in the heart." She

expressed feeling terrible when it would happen, that she felt like "puking," and that she could not think about it. D.D. recounted one incident in particular when her stepfather did the same thing to her sister H.H. on the pillow next to her. D.D. explained these acts always happened when her mother wasn't home (she worked the night shift) and that her stepfather would stop if he thought he heard someone.

D.D. told the interviewer that before she told Z.H. and H.T. about what her stepfather had done, she had first told her mother. D.D. said that her mother asked questions about what her stepfather had done, and then her mother started crying. D.D. ultimately told the interviewer she didn't want to discuss it anymore.

After the children's forensic interviews, the mother sat for an interview of her own. She denied any prior knowledge of inappropriate touching and claimed her daughters reported the sexual abuse based on a video of monkeys "humping" that they'd seen on YouTube. When asked if the stepfather was still living in her home, she claimed not to know, and specifically that she didn't know if he continued to sleep there, as she worked the night shift.

A few weeks later, H.H. and H.T. were interviewed again. H.H. as before refused to discuss the sexual abuse allegations, saying that D.D. now said "it was only a dream." But she expressed other unspecified apprehensions about her stepfather. She said she wouldn't feel safe alone with her stepfather but refused to elaborate. She also said she didn't think D.D. would be safe alone with her stepfather. When asked why, she told the interviewer she didn't know. When the interviewer asked H.H. whether she really didn't know or whether she said that because it was hard to talk about, she said, "The second one," but again refused to elaborate. H.H.

said she wanted to stay with her mom and her siblings but didn't want her stepfather to live with them.

DHS determined the reports of sexual abuse "founded" as to both D.D. and H.H.

**B. The Child-in-Need-of-Assistance Proceeding.** In April 2018, the juvenile court entered an order removing the children from the mother's custody and forbidding the stepfather from having any contact with the children or access to the children's residence.

In May, the juvenile court adjudicated all five children in need of assistance under Iowa Code sections 232.2(6)(*c*)(2) and 232.2(6)(*d*) (2018). The juvenile court made its own review of D.D.'s forensic interviews and found credible her allegations of the sexual abuse, noting D.D.'s recitation of "details that would be impossible to come up with without direct experience." The juvenile court found that D.D.'s mother failed to believe the abuse allegations, that she told the children not to disclose any information about them, and that she made no effort to remove the children from the home she shared with her children's perpetrator until DHS became involved. The juvenile court's order notes the stepfather had been charged with second-degree sex abuse, a class "B" felony, with D.D. as the named victim.

In adjudicating the children in need of assistance, the juvenile court cited

> extensive sexual abuse of the child [D.D.] in the mother's home, the severe trauma being suffered by the child [D.D.] in the mother's and any relative's home, the mother's lack of any protective capabilities toward her children to prevent abuse in the home and to protect her children, and imminent risk of further harm, abuse, and death of the children if remaining in the mother's custody.

The adjudication order also describes other concerns beyond the sexual abuse. The juvenile court cited testimony from school officials concerning D.D.'s behavioral problems and that D.D., while in her mother's and aunt's care, would spend many hours of her school day sleeping instead of doing schoolwork. The school officials testified this problem, along with severe hygiene problems that D.D. exhibited while in her mother's and aunt's care, completely ceased when D.D. lived for a period with foster parents through a DHS placement.

In June, the juvenile court entered a disposition order declaring the children in need of assistance under chapter 232. The juvenile court again found "that the significant issues in this matter involve the sexual abuse of the children [D.D.] and [H.H.], the mother not believing the abuse occurred, and the mother failing to protect her children from sexual abuse or any harm." It noted that the stepfather had bonded out of jail on the sexual abuse criminal charges and was again residing with the mother. The record indicates the criminal charges against the stepfather were ultimately dismissed, but only after D.D. refused to testify at a deposition in the criminal case with her stepfather present.

With the five children each placed in separate homes following the disclosure of the sexual abuse, D.D.—the victim—was now being blamed for the family's dispersal. The juvenile court noted this, stating it was "very concerned at this time regarding the mother's protective capabilities of all children and continual victimization of [D.D.] for reporting the abuse occurring in the home." The juvenile court's bottom-line reasoning was clear: "The Court cannot return any child to the mother's custody unless it is convinced that the mother, through her participation in services, can and will protect her children from abuse and harm in the future, improve her parenting, and provide for their basic needs."

Thirteen months later, in July 2019, after considerable and ongoing individual and family therapy, the juvenile court modified the dispositional order to permit the children to return to the mother's custody. The juvenile court conditioned the children's return on the stepfather's removal from the family home.

In November 2019, the juvenile court permitted the stepfather to move back into the home with the mother and children. The juvenile court noted the progress from the extensive therapy services provided to family members in both individual and family settings. Therapists reporting to the juvenile court found the family had progressed to the point that the children could return to their mother's care with the stepfather back in the home and reasonable safety measures in place. Safety measures appear to have included forbidding the stepfather from being alone with the children and installing alarms on the children's bedroom doors in the home. Although the stepfather at all times denied committing the sexual abuse that both DHS and the juvenile court determined had occurred, his therapist reported that he met the goals DHS set for his participation in individual therapy.

It appears the stepfather never addressed the accusations of sexual abuse with his therapist. His most recent therapist explained she had been working with the stepfather on the difficulties of DHS's involvement with the family, "his concerns about the children, his feelings, and what he can do to assure the children are safe, feel safe in disclosing any issue, and changes he wants to make when reunited." Yet the therapist told the DHS worker that the stepfather "never alludes to sexual abuse." He had to switch to this therapist in April 2019 after his prior therapist discovered the stepfather was seeing him to address sexual offenses, which that prior therapist did not treat. Leading up to this switch, the juvenile court's

March 8, 2019 order finding DHS failed to make reasonable efforts reported,

> The [stepfather's] counseling appears to center around depression. It is clear that he has not addressed with his therapist his feeling of being accused by his step-children as being a sexual perpetrator. It is also clear that his current therapist knows very little as to what brought [the stepfather] to therapy—due to lack of communication from the department and a continued complete lack of insight and accountability by [the stepfather].

D.D.'s therapist, too, signed off on the stepfather's return, indicating her belief that D.D. would be able to speak up if she felt unsafe around her stepfather, according to the November 2019 order. The order imposed on the mother the duty to "protect all her children from any form of abuse and harm." All parties stipulated to the stepfather's return to the home, except one: D.D.'s father, who had been incarcerated throughout the matter.

In February 2020, not quite three months after the stepfather's return to the home, the juvenile court dismissed the child-in-need-of-assistance proceeding. The juvenile court noted that the children "report they are happy in the home and feel safe" and found "there are no further safety concerns for any of the children [while] in the mother's custody." All parties stipulated to the dismissal of the proceedings, again with the exception of D.D.'s father.

D.D.'s father appealed the dismissal of the proceedings, and we transferred the appeal to the Iowa Court of Appeals. The court of appeals affirmed the juvenile court's dismissal. We granted D.D.'s father's application for further review.

## II. Record Completeness Challenge.

Before addressing the merits, we must address the State's argument that D.D.'s father waived the issues raised in this appeal because he failed

to produce the transcript from the February 11 hearing that preceded the juvenile court's dismissal order. The State contends our appeal record is insufficient because the appeal record contains no written transcript from that hearing. The court of appeals didn't address this issue in its ruling; the State raises it for the first time in its supplemental brief following our grant of further review.

Under Iowa Rule of Appellate Procedure 6.204, the appellant in appeals from child-in-need-of-assistance proceedings "shall request the clerk of the district court to transmit the record to the clerk of the supreme court" within thirty days of the notice of appeal. The appeal record "shall include the . . . court file, including all exhibits," and "[a]ny transcript of a hearing or hearings resulting in the order from which an appeal has been taken." Iowa R. App. P. 6.204(1)(*a*)–(*b*).

D.D.'s father filed his request with the clerk of the district court to transmit the record as he was required to do and included a direction to the court reporter to prepare transcripts of all hearings. The court reporter complied with the request to prepare transcripts of all the hearings in the case except the February 11 hearing. The court reporter indicated that she didn't attend it and, instead, that the juvenile court made an audio recording of the hearing. The juvenile court's February 11 order also states the hearing was recorded.

The audio recording of the hearing was made part of the court file transferred to the supreme court for this appeal. The recording discloses that the hearing lasted about ten minutes and consisted only of arguments by counsel. No party presented any witnesses or testimony and, consistent with this, the juvenile court's February 11 order doesn't refer to any testimony relied on from the hearing. The order refers instead to three exhibits offered into evidence without objection by counsel, each of

which was included in the court file for this appeal. While the State correctly recites that an appellate court may not speculate as to what took place in the district court or predicate error on such speculation, *In re F.W.S.*, 698 N.W.2d 134, 135 (Iowa 2005), the complete record before us fully extinguishes any need for speculation. Having before us all that the district court had before it when it entered the dismissal order, we proceed to the merits.

**III. Challenge to the Juvenile Court's Dismissal.**

We review child-in-need-of-assistance proceedings de novo. *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). We review the facts and the law and "adjudicate rights anew." *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001) (en banc) (quoting *In re H.G.*, 601 N.W.2d 84, 85 (Iowa 1999)). We give weight to the juvenile court's factual findings, but aren't bound by them. *Id.* The paramount consideration in child-in-need-of-assistance proceedings is protecting the best interests of the children. *In re H.G.*, 601 N.W.2d at 85.

The court may terminate a child-in-need-of-assistance dispositional order if it determines either of the following circumstances exist:

> *a.* The purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment.
>
> . . . .
>
> *d.* The purposes of the order have been sufficiently accomplished and the continuation of supervision, care, or treatment is unjustified or unwarranted.

Iowa Code § 232.103(4)(*a*), (*b*); *see also In re K.N.*, 625 N.W.2d at 733–34.

The purposes of the child-in-need-of-assistance order in this case centered on protecting the children from further sexual abuse and severe trauma being suffered by D.D. in the mother's home resulting from "the

mother's lack of any protective capabilities toward her children to prevent abuse in the home and to protect her children, and imminent risk of further harm, abuse, and death of the children if remaining in the mother's custody." The purpose of the order was to protect the children from further continued sexual assault by the stepfather in the home.

The State acknowledges that D.D. has, once again, been forced to live with "a man who sexually abused her in the past." The State reminds us that we don't live in an "ideal world," and that it isn't the DHS's or the juvenile court's job to create a "utopia" for families. And indeed that's true. Yet we find, on the record in this case, that very little at the core of the problem identified in the original order was fixed or changed in the intervening period. And in so finding, we conclude that the statute's purposes have not been met justifying a dismissal of the proceedings.

DHS's final report recommending dismissal of the proceedings states, "This family has had a year of services including family and individual counseling. . . . The family has put the work in to reunify." But terminating a child-in-need-of-assistance proceeding isn't an exercise in box-checking. Progress in therapy and similar efforts to "put the work in" are unquestionably important. But the statute doesn't ask whether all the boxes have been checked or the work put in; it asks whether the child remains in need of supervision, care, or treatment. And that answer remains, unequivocally, yes.

The evidence shows D.D. felt pressure—and took unfair blame— from her siblings about the fact the family had separated when the sexual abuse came to light. Her mother posted "free [stepfather]" on her Facebook status when the stepfather was facing criminal charges for sexually abusing D.D., and at least one of D.D.'s siblings could see this status. Her mother also told the children that she did not believe them. D.D. told the

school social worker that her siblings blamed her for their removal and that "they tell me it's my fault that we can't be with our mom." Her older brother would not respond to her at school, and her oldest sister lashed out on her. D.D. was also being called a liar at school. Even in the final DHS report before the dismissal in February, the DHS worker reported D.D. was still describing feelings that her siblings were mean to her.

It's unsurprising that child victims of abuse seek to return to living with their siblings and parents, and all the familiarity of the home life they previously knew, after a court orders their removal from the home. But the expressed desire of D.D. and her other siblings to return home with their mother and stepfather under these circumstances has little bearing on the determination of whether the purposes of the child-in-need-of-assistance order have been accomplished.

That need still exists, and in great measure. Two months before the juvenile court dismissed the child-in-need-of-assistance proceeding—and three weeks after her sexual abuser had moved back into her home—D.D. expressed suicidal ideations at school. When the social worker pressed the mother and stepfather about the issue, the couple appeared unconcerned with D.D.'s potentially life-threatening situation. (Her mother claimed D.D. was just upset because she could not attend the school bookfair.) D.D.'s apparent backslide continued into 2020. In January, D.D.'s teacher contacted DHS about her recent poor behavior. Again, when the social worker asked the mother and stepfather about the situation, they once again were dismissive. The stepfather in particular was so dismissive of the school's concerns about D.D.'s mental and physical health that he suggested removing D.D. from the school.

We find little comfort in the claim that therapy has achieved sufficient measures of protection and prevention when the primary agents

of that protection and prevention—the mother and the stepfather—refuse to believe that any abuse ever occurred. *See In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002) (noting that sexual offender treatment where the offender refuses to take responsibility for the abuse may constitute ineffective therapy); *In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988) (noting "the requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs"). It bears repeating that D.D.'s account of the sexual abuse is so detailed that it is hard to imagine she could describe these events as a seven year old with such detail unless she actually experienced them, and it is even more difficult to imagine her story stems from a YouTube video of monkeys as D.D.'s mother claimed.

It's folly to think the mother will stand sentinel to protect against a foe she doesn't acknowledge exists. This situation is especially troubling because this isn't the mother's first time dismissing the dangers of having her children around sexual offenders. She has a founded child abuse assessment from 2014 for allowing D.D.'s sister to be left alone in the care of the mother's brother, a registered sex offender. When the psychologist asked the mother about this during her psychological assessment, she minimized the situation by claiming she didn't think she violated any rules leaving her daughter with her brother. The mother expressed certainty her brother would never do anything inappropriate with her children, even though she was unsure of the details as to why her brother was on the sex offender registry. She told the psychologist that her brother's sexual offense had something to do with a time he was babysitting, but she did not know what he did.

We have no basis to assume that the mother would react any differently to a new report of sexual abuse by D.D. than she did with D.D.'s

prior reports. And a little girl certainly should not be called to serve as her own guardian against an adult sexual abuser lurking under her own roof. The family counselor's final report submitted to the juvenile court before it dismissed the proceeding said precisely this, observing that based on D.D.'s age and size she wouldn't be able to protect herself from abuse by her stepfather.

On the subject of D.D.'s capacity for self-protection, we dare to ponder the lessons D.D. must have learned from all of this so far. In light of how these events unfolded from her perspective, why would we expect her to report any new abuse? Her prior reports brought disbelief from her own mother and anger and resentment from her siblings, only for her to wind up back in the same home with her sexual abuser. She's seen both the significant effect her reports have had on her family and the miniscule effect they've had in distancing her from her sexual abuser. One could hardly blame D.D. for coming to the same conclusion that her nine-year-old sister H.H. came to first: No one can be trusted.

As to the safety measure prohibiting the stepfather from being alone with the girls, without the child-in-need-of-assistance proceeding to monitor compliance, there's no ready way of holding the parents accountable on this requirement. We have to assume the mother's impetus to enforce such a rule would be nonexistent. After all, if he didn't sexually abuse her daughters—as she insists he didn't—what's to be concerned about? Now add to her indifference the mother's proven willingness to *lie*—as the juvenile court found—about these matters, both by claiming to DHS she didn't know about the sexual abuse allegation after it happened when she really did, and by coaching the children to lie or not to talk about what happened in their interviews.

And the suggestion that alarms on the children's bedroom doors will protect them—or provide any meaningful benefit—is particularly wanting. D.D.'s recitation of the abuse indicates the sexual abuse happened after the stepfather summoned her and H.H. to his own bedroom to watch movies and proceeded from there. And it must be asked: What's the effect on a little girl when she must arm an alarm on her bedroom door to protect her from the real possibility that her stepfather will creep down the hall and invade her room to rape her as she sleeps? Reports of D.D.'s continued sleeping problems at home and at school after the stepfather's reintroduction into the home come as no surprise.

While we agree that creating a family utopia certainly can't be DHS's pursuit, nor can permitting child sexual abusers to live with their victims when the sexual abuser has never admitted to the act and thus cannot have been "treated" to fix it, and when the victim's only hope of protection is a mother who has steadfastly denied the fact of her husband's sexual abuse of her children and thus can be counted on for no measure of protection. The purposes of the order have not been accomplished but, more accurately, abandoned.

The State correctly notes that child-in-need-of-assistance proceedings are intended to provide children necessary, but temporary, protection. *See, e.g.,* Iowa Code §§ 232.101(2) (supervision without removal limited to three years), .104 (requiring permanency after one year when children have been removed). The juvenile court's permanency goal was reunification with the mother. That goal could have been—and was— accomplished without reintroducing the stepfather back into the home. But in light of the order permitting the stepfather to move back into the home, the purposes of the child-in-need-of-assistance order have not been accomplished, and continuation of D.D.'s "supervision, care, or treatment"

through continued proceedings is justified and warranted. *Id.* § 232.103(4)(*a*), (*d*).

### IV. Conclusion.

Under the statutory standard applicable to this case, dismissal was improper. *See In re R.G.,* 450 N.W.2d 823, 825 (Iowa 1990). We thus reverse the juvenile court's dismissal of the proceeding and remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED.**

Christensen, C.J., and Appel, Waterman, and Oxley, JJ., join this opinion. Christensen, C.J., files a special concurrence. Mansfield, J., files a dissenting opinion in which McDonald, J., joins.

**CHRISTENSEN, Chief Justice (concurring specially).**

I agree with the majority and write separately to highlight the problems with the actions of DHS and the juvenile court in this case. I see no need to recite the facts given the majority's thorough overview of them. This is the bottom line: Mom is free to choose to live with the man who sexually abused her child, but the child should not be forced to live with her sexual abuser. In its dismissal order, the juvenile court found "no further safety concerns for any of the children in the mother's custody and that dismissal of this matter is appropriate and in the children's best interest." The juvenile court issued this ruling despite the absence of any evidence in the record showing Mom ever acknowledged D.D.'s sexual abuse and Mom's decision to choose D.D.'s abuser over D.D. It allowed Stepdad—who was named as the perpetrator of sexual abuse against D.D.—to return to the home in November even though it appears he never addressed the accusations of sexual abuse with his therapist.

While the State may not specifically require an admission of guilt as part of treatment because it impinges a person's right against self-incrimination, "a person's exercise of a constitutional right *may* indeed have consequences" in the parental rights realm. *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002). "A parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children." *Id.* Here, there is no evidence that Mom or Stepdad adequately (or even minimally) acknowledged, yet alone addressed, their role in D.D.'s abuse. Nobody is asking Mom to incriminate herself because she has never faced criminal accusations in this case, but she continues to deny any abuse occurred in the face of credible evidence to the contrary out of an apparent desire to protect Stepdad at D.D.'s expense. Our caselaw has

long acknowledged "the requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs." *In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988).

A letter dated September 12, 2018 from D.D.'s therapist to the DHS social worker reports the social worker told the therapist over the phone that the criminal "charges were dropped after [D.D.] 'refused to say anything' at a deposition conducted with her step-father present." The further review application similarly notes, "the District court case in this matter relies heavily on the fact that the perpetrator was not found guilty in a criminal matter however this was after the victim was afraid to testify in depositions for the criminal matter." Regardless of why the criminal charges were dropped, the sexual abuse report against Stepdad remains founded and the juvenile court made similar findings that the sexual abuse occurred.

It is not surprising D.D. refused to say anything given the pressure on her to recant from Mom and the blame she faced from her siblings for their removal. Furthermore, sexual abuse allegations are not contingent upon companion criminal charges. We do not apply the criminal standard of proof beyond a reasonable doubt in CINA cases. Rather, the CINA adjudication of D.D. under Iowa Code section 232.2(6)(*d*) only required a showing that D.D. "has been, or is imminently likely to be, sexually abused by the child's parent, guardian, custodian, or other member of the household in which the child resides." Iowa Code § 232.2(6)(*d*) (2018). There is already a founded report of sexual abuse against Stepdad for abusing D.D., regardless of the absence of a criminal conviction in this case, and that report supports D.D.'s CINA adjudication under section 232.2(6)(*d*).

Nevertheless, the juvenile court somehow went from insisting Mom's "continuing to reside with her husband who has been previously found to have sexually abused [D.D.]" was a barrier to D.D.'s return to Mom in May 2019, to allowing D.D. to return to Mom in July, and then to allowing D.D. to live with Mom and Stepdad—D.D.'s sexual abuser—in November. The juvenile court then dismissed the CINA dispositional order altogether in February 2020, precluding any real oversight to ensure D.D.'s safety in the home. DHS similarly made a 180-degree shift from its earlier position of insisting Mom's denial and continued relationship with Stepdad were barriers to returning D.D. to Mom's care.

Again, these decisions were in the face of D.D.'s suicidal comments and ongoing behavioral issues, a January 2020 Family, Safety, Risk, and Permanency (FSRP) report that declared D.D. "would be unable to self protect" due to her age and size, Mom's and Stepdad's continued denial of the abuse, Mom's decision to continue living with Stepdad, pressure from Mom on D.D. to recant the allegations, and sibling blame on D.D. for their removal from Mom. I am hard-pressed to see how "[t]he purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment," or "[t]he purposes of the order have been sufficiently accomplished and the continuation of supervision, care, or treatment is unjustified or unwarranted" such that the juvenile court could terminate the CINA dispositional order under these circumstances. Iowa Code § 232.103(4)(*a*), (*d*).

Reunification is a *goal*, not a mandate. The permanency goal in this case was to reunify D.D. with Mom—a goal that could have been accomplished without forcing D.D. to live with her sexual abuser. If Mom refuses to keep D.D. safe by forcing D.D. to live in the same home as D.D.'s abuser, then Mom—not the system—has drawn a harsh line in the sand

that precludes reunification. It is incumbent upon the juvenile court to determine an alternative course of action to keep D.D. safe instead of simply crossing its fingers and hoping Stepdad will not reoffend.

The State itself acknowledges on appeal "that in an ideal world D.D. would not be living with her step-father, a man who sexually abused her in the past." Nonetheless, it maintains the juvenile court acted appropriately in this case because the juvenile court "cannot impose moral judgments upon parents." It also claims, "[a] parent/child relationship cannot and should not be severed by the State simply because a court believes it would be in a child's best interests to have different parents." D.D.'s attorney[1] similarly stresses that Stepdad was never criminally convicted, and it is not in D.D.'s best interest to terminate Mom's parental rights based on Mom's denial of the abuse given that no criminal conviction occurred.

Frankly, ensuring the safety of the child when Mom refuses to acknowledge the child's sexual abuse and continues to reside with the child's abuser—even if that requires severing the parent–child relationship—is not simply passing moral judgment or acting out of a desire that the child has different parents. It is the job of the juvenile court to look out for the best interests of the child and to take the right action to keep the child safe regardless of what Mom wants, DHS recommends, or what the child's attorney recommends based on what the child wants. Chapter 232 is clear about that from the beginning in its rules of construction. Iowa Code § 232.1 ("This chapter shall be liberally construed to the end that each child under the jurisdiction of the court shall receive,

---

[1]As a point of clarification, the child's attorney is not the child's guardian ad litem and is in the position of having to advocate for D.D.'s desires. D.D. has been pressured by her family throughout this case, and it is not surprising that she has expressed her desire to be home with Mom and her siblings.

preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state. When a child is removed from the control of the child's parents, the court shall secure for the child care as nearly as possible equivalent to that which should have been given by the parents."). Ultimately, there is a difference between reasoned deference to the opinions of professionals involved in the case and blind acceptance on substantive matters. As the majority has already explained, the record (or lack thereof concerning Mom's acknowledgment of the abuse) does not support the recommendations for reunification.

On appeal, the State and D.D.'s attorney emphasize the timelines governing CINA cases in support of dismissing the CINA dispositional order in this case, arguing CINA cases cannot and should not be kept open indefinitely. Iowa Code section 232.101(2) provides,

> The duration of any period of supervision or other terms or conditions shall be for an initial period of no more than twelve months and the court, at the expiration of that period, upon a hearing and for good cause shown, may make not more than two successive extensions of such supervision or other terms or conditions of up to twelve months each.

The district court entered its dispositional order in July 2018 and had not exhausted the permitted statutory extensions when it dismissed the CINA proceedings in February 2020. Notably, nearly the entire first year of the family's involvement with DHS in this case was a waste of valuable time to make progress, as the juvenile found in March 2019 that DHS failed to make reasonable efforts to return D.D. and her siblings to the home. The juvenile court explained the family was not receiving adequate therapy and counseling and declared, "We are at a stalemate and have essentially lost months of potential progress." There was really a little

less than a year of reasonable efforts and services provided to this family before the juvenile court dismissed the CINA dispositional order.

In any event, these timelines are not meant to operate like an hourglass such that once the sand runs out, the juvenile court dismisses the case. It is not in the child's best interest to dismiss a CINA adjudication simply because time has expired when the purposes of the dispositional order have not been successful and the child remains in need. When the sand runs out and the child still is not safe, it is the juvenile court's responsibility to develop another plan for permanency. In this case, the juvenile court failed to plan for the possibility that reunification would not work.

Instead, the juvenile court continued to issue orders articulating that Mom's decision to reside with D.D.'s sexual abuser and her inability or unwillingness to acknowledge the abuse were barriers to D.D.'s return to the home. When Mom continued to behave this way despite these orders, the juvenile court seemed to throw its hands up in the air because, as D.D.'s attorney emphasized during oral argument, Mom and Stepdad had "checked the boxes" by participating in services—even if their participation simply involved going through the motions.

Perhaps unsurprisingly to many, it is not uncommon to terminate the parental rights of parents who continue to deny their child's sexual abuse and continue to reside with the child's abuser. To be clear, I am not saying the juvenile court should have terminated Mom's parental rights. Mom's only apparent parenting issue is her failure to acknowledge or address D.D.'s sexual abuse, but that is a *big* issue given that it has provided sufficient grounds for termination in many other cases. Hence, I cite some of the many cases where parental rights have been terminated in similar circumstances to emphasize the seriousness of this situation:

*See, e.g., In re K.L.C.,* 372 N.W.2d 223, 228 (Iowa 1985) ("Although [Mom] continues to deny knowledge of sexual abuse and refuses to acknowledge that it occurred, both her inconsistent explanations regarding how her son's penis was bruised and the children's knowledge of the intimate details of [Mom's] sexual activities contravene her assertions."); *In re C.N.,* No. 19–1861, 2020 WL 567283, at *1 (Iowa Ct. App. Feb. 5, 2020) ("[T]he children cannot return to the mother's home because the paramour [who sexually abused one of the children] continues to reside there"); *In re N.R.,* No. 19–0901, 2019 WL 4297913, at *2 (Iowa Ct. App. Sept. 11, 2019) ("The mother's actions—. . . supporting the father when his sexual behaviors presented an obstacle to reunification with the child—show her paramour is more important to her than the child."); *In re T.P.,* No. 19–0162, 2019 WL 3317346, at *4 (Iowa Ct. App. July 24, 2019) ("It is undisputed the sister suffered sexual abuse in the family home while in the mother's care. While the mother has denied knowledge of the abuse, we defer to the juvenile court's credibility finding that the mother's denial was 'completely unbelievable.' We conclude T.P. would be at risk of sexual abuse if he were to return to his mother's care."); *In re B.S.,* No. 19–0332, 2019 WL 2145852, at *2 (Iowa Ct. App. May 15, 2019) (Mom's "failure to recognize the effect of sexual trauma on the children and her inability or unwillingness to exercise her parental responsibilities to protect the children from further harm" support the conclusion that the children could not be returned to her care.); *In re S.B.,* No. 18–2204, 2019 WL 1294107, at *2 (Iowa Ct. App. Mar. 20, 2019) (affirming termination of the mother's parental rights under Iowa Code section 232.116(1)(h) "[i]n light of the father's risk of [sexual] reoffen[se] and the mother's ongoing contact with him."); *In re C.A.,* No.13–1987, 2014 WL 1234470, at *2 (Iowa Ct. App. Mar. 26, 2014) (canvassing Iowa cases that have held children could not

be returned to parents that continue to deny their child's sexual abuse and continue to reside with the child's abuser).

If our appellate courts affirm the termination of parental rights to parents for their failure to acknowledge their child's sexual abuse and continuing to reside with the child's abuser, then it is difficult to fathom why we would affirm the dismissal of a CINA petition that only seeks to provide a family in similar circumstances with supervision, care, and treatment. Doing so would call into question the validity of many appellate opinions—some published and more unpublished—in which our courts have stressed the need for a parent to at the very least acknowledge the child's abuse before the child can be safely returned to the parent's care. To reiterate: Mom is free to choose to live with the man who sexually abused her child, but the child should not be forced to live with her sexual abuser.

This case involved forcible penile intercourse. During her forensic interview, D.D. described her sexual abuse by stating, "[I]t makes my body feel like it's getting stabbed in the heart." I cannot imagine another scenario in which a court would ever expect victims of such serious sexual abuse to share living quarters with their sexual abuser, but that is what the service providers, the juvenile court, and the child's own attorney expected here. It is unacceptable.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent. I would affirm the decision of the court of appeals and the order of the juvenile court.

Bad facts make bad law. Or maybe bad facts make no law at all. Reading the majority opinion, it is difficult to know what the legal takeaway is. The driving principle behind the majority opinion appears to be that this court needs to do *something more* for D.D.

It is not as if DHS and the juvenile court didn't try. The majority's references to "box-checking" are unfair to both of them. A single DHS social worker and a single juvenile judge consistently handled this case over the course of nearly two years from beginning to end. From what I can tell, they did a very conscientious job. The majority second-guesses both of them, as well as the counselors and therapists who worked with this family, and decides it can do better. But what the majority substitutes is not a viable solution and goes beyond the proper role of an appellate court.

## I. Recap of the Facts: A Very Challenging Situation.

In the spring of 2018, DHS founded a report that D.D.'s stepfather had sexually abused her and one of her siblings. D.D. and her four siblings were adjudicated children in need of assistance and immediately removed from the family home. For the next year, the children generally lived with relatives under the supervision of DHS.

D.D.'s mother and stepfather denied that the sexual abuse had occurred. Criminal charges were filed against the stepfather but dropped in June. The video interview of D.D. is very disturbing and credible in its details. DHS believed and continues to believe that the abuse occurred, but the allegations have never been adversarially tested in court. The

other sibling, whom D.D. identified as also being a victim of sexual abuse, did not disclose any sexual abuse, although she reported that the mother and stepfather would be mean to her and at times engage in physical abuse.

Upon her removal from the home, D.D. underwent biweekly therapy for approximately six months. In November 2018, the therapist prepared a report. The report indicated D.D. "feels safe and has no negative thoughts or feelings about seeing [the stepfather]." The therapist said that she was unable to determine if sexual abuse had occurred based on her sessions with D.D. To her, it was "inconclusive if [D.D.] is a victim of sexual abuse." She recommended that D.D. be referred to a specialist in treating child trauma and abuse. Sessions with that therapist began in February 2019.

After three months of biweekly sessions with D.D., that therapist provided a May 2019 report. The report stated,

> [D.D.] identified she is living with her grandfather due to what she calls the 'secret situation' which occurred between herself and [the stepfather]. [D.D.] verbalizes she doesn't want to have any touching with [the stepfather] other than hugs and kisses, but she does want to see him again. She does consistently share she misses her mother, enjoys their visits and wants to be back in her home.

The report concluded,

> If the children are recommended to return home, I believe it would be in their best interest to do so without [the stepfather] in the home at first. This will give time to ensure the children are stabilized with their mother and progress is established in counseling for all family members. Then it could be considered to transition [the stepfather] back into the family through supervised visits, to ensure the children are safe and comfortable. It seems appropriate to utilize the services of DHS and FSRP to monitor these interactions. There is a concern for [the mother's] ability to protect the children as [D.D.] reports her mother knew of the 'secret situation' and she wishes her mother would have done something about it. Family counseling sessions between the

children and their mother should address this in hopes of increasing her protective capacity in the future.

Nonetheless, in a hearing later that month, the juvenile court continued to order that the children remain in relative care and that further services be provided.

The juvenile court held regular hearings throughout 2018 and 2019, as well as additional hearings when the situation demanded. The mother received a detailed psychological evaluation from a psychologist based on a series of screening tests and in-person appointments. The stepfather went through months of counseling, paying for the appointments out of his pocket because insurance did not cover them. He continued to deny that the abuse had occurred but agreed to establish and honor boundaries in the home and participate in family counseling.

All the children consistently indicated they wanted to be back home with their mother. Finally, in July 2019, with DHS's support, the juvenile court modified the dispositional order and ordered that the children could be returned to the home—subject to the stepfather removing himself from the home. The court noted that D.D.'s therapist was in agreement with this recommendation.

Six weeks later, in late August, DHS updated the court with a detailed report. The DHS social worker reported that D.D. was doing well with her counselor, i.e., the same therapist D.D. had been seeing since February who specialized in child trauma and abuse. Based on those sessions, "[D.D.] didn't seem worried or triggered to see [the stepfather] and [was] confident they could move forward and be a family again. She still says she wants [the stepfather] to live back at home with them." Family therapy had commenced and had been going well. At this point,

the juvenile court granted a DHS motion to allow the stepfather visitation at DHS discretion.

In November, the family therapist reported she "has no safety concerns for the family." D.D.'s therapist said that she "had not gotten anything but positive feedback" from D.D. On DHS's recommendation, the juvenile court ordered that the stepfather could return to the family home.

Lastly, in February 2020, on DHS's recommendation, the juvenile court dismissed the CINA proceeding. The DHS social worker—again, the same caseworker who had lived the case from the beginning—noted,

> [The stepfather] has been back in the home since 11/21/19. All of the children report that they are happ[y] [in] the home and feel safe. [D.D.] will tell ["]stories" at times at school that when investigated are not credible. She shared that she had ["]slept with dad" and in reality she had laid a blanket on him while he was sleeping on the floor of the living room. When this worker talks to [D.D.] about these stories she usually will tell this worker the truth and state she does not know why she says the things she does.

The DHS social worker went on to note that D.D. has been "struggling" in school and was working with her therapist on "the difficulties she had at school shutting down." The therapist had made clear to the mother that D.D. would need to continue therapy even if DHS was no longer involved.

## II. The Majority's Second-Guessing Is Not the Right Approach.

No one can doubt that this is a difficult situation with no good answers. A child maintains she was sexually abused, the allegations appear credible, the county attorney apparently did not have enough to prosecute, and the child's mother and the stepfather-alleged-abuser deny that anything occurred. In that event, I would defer to those with expertise and first-hand knowledge, i.e., D.D.'s therapist, the DHS social worker, and the juvenile court judge. All reached the same conclusion about what

would be the "least bad" alternative: namely, to let the family reunify after nearly two years of separation and services.

Although we conduct a de novo review, "we give weight to the juvenile court's factual findings." *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001) (en banc). Even on de novo review, we afford deference "for institutional and pragmatic reasons." *Struve v. Struve*, 930 N.W.2d 368, 371 (Iowa 2019) (quoting *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017)).

The majority offers a very different approach, one that requires a good degree of self-confidence. The majority believes it can psychoanalyze D.D. better than her own therapist. I disagree. The majority believes that DHS and the service providers haven't been trying hard enough. I disagree. The majority believes that the permanency goal should be reunification of the family without the stepfather. Like DHS and the juvenile court, I don't believe that is feasible. Two years have passed, the mother and the stepfather are still together, and they continue to deny that the sexual abuse occurred. Those things aren't going to change.

Even with today's reversal, the CINA proceedings are legally over for everyone except D.D. The gist of the majority ruling is that it was a gross error to let the stepfather back into the family home, and he should be removed again. But that seems unachievable, because the courts only have jurisdiction over D.D., not the other four siblings. Also, nobody appealed the modified dispositional order in which the juvenile court allowed the stepfather to return to the home.[2]

---

[2]As the juvenile court later explained at the time of entering its dismissal order,

When the court entered its order back in November [2019] it was with the understanding that that was the time in which the court had to make the determination as to whether or not [the stepfather] could be returned back to the home in order to allow for this family essentially to be reunified.

Maybe the majority has a notion that DHS will keep monitoring the home, but to what end?[3]  Monitoring can't last forever, *see* Iowa Code section 232.101(2), and occasional drop-ins by service providers aren't going to protect D.D. much more than the alarms the majority dismisses, if the mother and stepfather are as dangerous as the majority thinks they are.  In reality, the logical endpoint of the majority's approach would be the removal of D.D. from the home, her separation from her siblings, and her placement in a new adoptive home.

I understand the majority's frustration with what has happened.  Yet the DHS social worker and the juvenile court are not naïve.  They undoubtedly went through the same thought process and endured the same frustration with the mix of imperfect choices before them.  But the law—Iowa Code section 232.103(4)—poses a quintessentially *practical* question: What further purpose will be served by continued supervision, care, or treatment?[4]  On that score, I have difficulty saying that I know better.

Making the majority's decision even more troubling is the alignment of the parties in this case.  Here, we can reasonably expect three parties to be advocating for D.D.'s interests: (1) the guardian ad litem (GAL), (2) D.D.'s attorney, and (3) DHS.  To that I would probably add the dedicated and experienced juvenile court judge who conducted

---

[3]That was the sum total of the father's request when he alone voiced opposition to closing the CINA proceeding, "I ask that this case stay open just so that we have continued oversight."

[4]Section 232.103(4) authorizes the juvenile court to "modify a dispositional order, vacate and substitute a dispositional order, or terminate a dispositional order and release the child if" the child no longer needs supervision because "[t]he purposes of the order have been accomplished," "[t]he purposes of the order cannot reasonably be accomplished," the efforts have been unsuccessful in fulfilling the order's purposes and other options are unavailable, or further supervision is unwarranted because "[t]he purposes of the order have been sufficiently accomplished."  Iowa Code § 232.103(4).

approximately a dozen hearings in this case. All of them support the decision below as the best for D.D. under the circumstances.

Only one party objected below and is appealing now: D.D.'s incarcerated father. The father has never met D.D. He is serving a lengthy prison sentence for attempted murder. Because of a mandatory minimum, he cannot be released until 2032 at the earliest. By that time, D.D. will be twenty-one years old.

Our court has been diligent in recent years in protecting the rights of incarcerated parents. *See, e.g.*, *In re M.D.*, 921 N.W.2d 229, 236 (Iowa 2018) (recognizing a parent's right to participate in entire termination hearing by telephone). The juvenile court respectfully considered the arguments advanced by the father's attorney at every step in the proceedings. But it is important to recognize that the father cannot offer any assistance in raising D.D. Critically, unlike the GAL, D.D.'s therapist, and the DHS social worker, he doesn't know D.D. Thus, we are essentially using the father's largely academic standing to express our own views of what DHS and the juvenile court should have done at earlier stages of the case. This deviates considerably from the appropriate, limited role of an appellate court. For this reason as well, I dissent.[5]

The central dilemma in this case is that *everyone* with firsthand knowledge and firsthand involvement favors family reunification as the least bad alternative. As appellate judges, we can pull selected items from the providers' reports, but we have to acknowledge that the authors of these reports and the individuals appointed to protect the children's

---

[5]Another issue is that of timing. Approximately one year has passed since this CINA case was closed and DHS was disengaged from this family. Because delays inherent in the appellate process can pose special problems for CINA and termination-of-parental-rights (TPR) cases, we require them to be routed immediately to the court of appeals on an expedited track. The benefits of that system are, of course, lost when such a case goes through an extra layer of appellate review.

interests unanimously support reunification. The legislature could have said that Iowa law categorically prohibits family reunification when there has been a founded sexual abuse report, regardless of what service providers, DHS, and the GAL may think. It didn't, and therefore, I believe we should affirm.

McDonald, J., joins this dissent.